[Doc. No. 24]

### THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

FRANCISCO BRAVO-GARCIA,     :
                           :

            Plaintiff,    :
                           :

     v.                  :     Civil No. 13-2185 (NLH/JS)
                           :

UNITED STATES OF AMERICA,    :
                           :

          Defendant.    :
_____:

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on the "First Motion to Amend/Correct Complaint" filed by plaintiff Francisco Bravo-Garcia. [Doc. No. 24]. The Court received the opposition of defendant United States of America ("Def.'s Br.") [Doc. No. 27] and plaintiff's reply ("Pl.'s Reply Br.") [Doc. No. 17]. The Court held oral argument. The crux of plaintiff's proposed amendment is his request to amend his *ad damnum* clause to reflect his demand for damages for "not more than $5,000,000, together with interest and costs." This amount exceeds the amount plaintiff claimed in his amended administrative claim ($1 million) filed pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2675. The Court must decide whether plaintiff is permitted to seek damages at trial in excess of $1 million. For the reasons to be discussed, plaintiff's motion is GRANTED.

Background

**1. Procedural History**

Plaintiff's claim arises out of a pedestrian/motor vehicle accident which occurred on September 15, 2010. Second Am. Compl. ("Compl.") [Doc. No. 1]. While working on a roadway as a driller's helper, plaintiff was struck in the head by the side mirror of a passing U.S. Mail truck which knocked him to the ground and rendered him momentarily unconscious. Compl. ¶¶ 11, 15. Plaintiff claims that as a result of the negligence and carelessness of the vehicle's driver he has suffered painful and permanent injuries. Compl. ¶ 24.

Plaintiff filed his first Notice of Claim with the United States Postal Service on January 12, 2012, which included a demand for damages totaling $250,000. Id. at 4-5. Initially, plaintiff believed his injuries were limited to herniations in his cervical spine and a torn rotator cuff. Pl.'s Br. at 4. Before defendant responded to the first Notice of Claim, plaintiff filed an amended claim on August 14, 2012 with a monetary demand of $1 million. Def.'s Ex. D-10.[1] Defendant denied the amended claim on February 19, 2013. Id. However, defendant concedes plaintiff may seek damages up to $1 million at trial. Plaintiff commenced the present action on April 6, 2013, claiming that defendant was negligent

---

[1] All of defendant's exhibit citations refer to the exhibits as marked by defendant in its opposition brief [Doc. No. 27].

under the Federal Tort Claims Act. See generally Compl. In the present motion, plaintiff seeks to amend his complaint to increase his damage demand "on the basis of new evidence and intervening facts related to the nature and extent of his injuries." Pl.'s Br. at 8.[2] Specifically, plaintiff seeks to add the following language: "WHEREFORE, Plaintiff, FRANCISCO BRAVO-GARCIA, Demands judgment against the Defendant, UNITED STATES OF AMERICA, on this Count for damages, not more than $5,000,000.00, together with interest, costs of suit and any other and further relief that the Court deems appropriate." Compl. at 5. To determine whether leave to amend should be granted, an in-depth consideration of plaintiff's post-accident medical history is required.[3]

### 2. Plaintiff's Medical History

The Court's analysis begins on January 21, 2011 with a neurological exam by Evren Burakgazi, M.D., who observed that as a result of the accident plaintiff had possible cervical radiculopathy at C6-C7, memory disturbance and chronic headaches. Def.'s Ex. D-12.[4] On February 23, 2011, plaintiff received his

---

[2] Plaintiff seeks to amend his complaint in two material ways. First, plaintiff seeks to increase his judgment demand from $1 million to "not more than" $5 million. Compl. at 5. Second, plaintiff has dropped his loss of consortium claim and removed Krista Bravo as a named plaintiff. Since no objection was made regarding the removal of the loss of consortium claim, this Opinion only addresses the issue of increased damages.

[3] All of plaintiff's medical treatment has been monitored by plaintiff's worker's compensation carrier, The Hartford.

[4] The Court has not been presented with any information explaining what treatment, if any, occurred between September 15, 2010 and January 21, 2011.

first electromyogram (EMG) which suggested plaintiff was negative for acute or chronic radiculopathy, plexopathy or local mononeuropathy. Def.'s Ex. D-13. This diagnosis would later be largely reversed by subsequent EMG studies. On June 30, 2011, Joseph Kozielski, M.D., an orthopedic surgeon, performed surgery on plaintiff's left shoulder to repair his torn rotator cuff. Pl.'s Ex. B.

In the spring months of 2012, plaintiff's doctors were cautiously optimistic regarding plaintiff's long-term prognosis. This is evidenced by the fact that on April 10, 2012, plaintiff was released to return to work on light duty by Joan F. O'Shea M.D., a neurosurgeon and orthopedic spine specialist. Pl.'s Ex. D.[5] Nonetheless, Dr. O'Shea also recommended an anterior cervical discectomy and fusion at C3-4 and C4-5. Id. She noted that plaintiff experienced neck pain, arm pain and memory difficulty. Id. On May 10, 2012, Bruce D. Lipsius, M.D., a neurologist, observed that plaintiff complained of memory loss, headaches, neck pain, and left shoulder pain. Def.'s Ex. D-14. Dr. Lipsius opined that plaintiff may have "a seemingly uncomplicated closed head injury." Id. Dr. Lipsius saw plaintiff again on June 28, 2012 and noted that plaintiff had "exquisite shoulder pain" and "was likely depressed." Def.'s Ex. D-16.

---

[5] In fact, plaintiff has not returned to work and has filed for permanent disability benefits. See Pl.'s Ex. N.

By July 2012, the forecast began to change. On July 11, 2012 plaintiff met with Robert P. Falconiero, D.O., an orthopedic surgeon. Def.'s Ex. D-17. Dr. Falconiero noted that plaintiff associated his pain to be within his neck and not within his shoulder. Id. He diagnosed plaintiff with neck pain, incomplete rehabilitation of the left shoulder and depression, among other less relevant diagnoses. Id. Dr. Falconiero opined that plaintiff could not return to his former type of work. Id. He recommended that plaintiff focus on the recovery of his cervical spine injury and then move on to shoulder rehabilitation. Id. On July 26, 2012 plaintiff was again seen by Dr. Lipsius who evaluated plaintiff's recent MRI exam. Def.'s Ex. D-18. Dr. Lipsius opined that plaintiff's brain scan was normal but that plaintiff had some sinus issues. Id. Dr. Lipsius recommended cervical spine surgery to remedy plaintiff's disc herniations and a neuropsychological exam if plaintiff's depression did not improve. Id.

On August 14, 2012 plaintiff filed his Amended Notice of Claim, which increased his demand from $250,000 to $1 million. Pl.'s Ex. F. Ten days after plaintiff filed his Amended Notice he underwent the recommended cervical discectomy and arthroplasty performed by Luis A. Cervantes, M.D., a neurosurgeon. Pl.'s Ex. E.

In October, 2012, plaintiff's diagnoses remained consistent with prior determinations. On October 10, 2012, John R. McGowan, Ph.D., performed a neuropsychological evaluation of plaintiff.

5

Pl.'s Ex. I. Dr. McGowan noted plaintiff had some depressive symptomology and recommended psychotherapy. Id. He also noted plaintiff had memory problems, left arm pain and numbness in his left hand and fingers. Id. Dr. McGowan opined that plaintiff's scores were indicative of symptom magnification and concluded there was "little evidence to suggest that he suffers from continuing cognitive complaints related specifically to traumatic brain injury." Id.

By November 2012 the tide began to materially change as plaintiff's prognoses worsened. On November 7, 2012 plaintiff underwent a second EMG performed by Kavita Gupta, D.O., who reported that plaintiff had multilevel cervical radiculitis and radiculopathy at C7, C8 and T1, a diagnosis contradictory to the February 13, 2011 EMG which ruled out these conditions. Pl.'s Ex. G. On January 16, 2013 plaintiff was seen by Dr. Kozielski who opined that plaintiff may be suffering from brachial plexopathy[6] and recommended another EMG. Def.'s Ex. D-20. Plaintiff saw Dr. Cervantes on January 24, 2013. Def.'s Ex. D-21. Dr. Cervantes disagreed with Dr. Kozielski's suggestion that plaintiff had brachial plexopathy and stated, "I have no clue where Mr. Bravo's

---

[6] The Attorneys' Dictionary of Medicine defines an equivalent term, "brachial plexus neuropathy," as "an acute form of neuropathy (disease of nerves) marked by pains in the shoulder girdle [] followed by weakness of the muscles supplied by the nerves of the brachial plexus and mild loss of sensation." Vol. 1 A-CC, J.E. Schmidt, M.D., *Attorneys' Dictionary of Medicine*, (Matthew Bender).

problems or complain[t]s are coming from." Id. On January 28, 2013 plaintiff underwent his third EMG study. Def.'s Ex. D-23.

Plaintiff saw Dr. Cervantes again on February 6, 2013. Def.'s Ex. D-24. Dr. Cervantes opined that plaintiff's cervical spine injury was "doing well" and noted that plaintiff described his pain as now mainly related to his shoulder. Id. According to plaintiff's case manager, Dr. Cervantes felt that the third EMG did not show plaintiff had a brachial plexus injury. Def.'s Ex. D-25. On June 14, 2013 plaintiff was seen by Louis Spagnoletti, M.D., a specialist in physical medicine and rehabilitation. Def.'s Ex. D-27. After reviewing plaintiff's third EMG, Dr. Spagnoletti concluded that plaintiff suffers from cervical radiculopathy, myofascial pain syndrome, a left rotator cuff injury, cervical degenerative disc disease and a closed head injury with post-traumatic cephalgia. Id. On March 31, 2014 plaintiff had a follow-up visit with Dr. Kozielski. Pl.'s Ex. L. Dr. Kozielski interpreted plaintiff's January 28, 2013 EMG to show "chronic changes both in the biceps, infraspinatus, and deltoid implicating C5 and C6 nerve roots and/or upper trunk brachial plexus pathology." Id. He diagnosed plaintiff's injury to be in the cervical spine, brachial plexus and left shoulder. Id. Thus, it appears that while Dr. Cervantes does not believe plaintiff suffers from brachial plexopathy, Drs. Spagnoletti and Kozielski do.

7

Plaintiff began consulting with Joel Glass, M.D. for psychiatric treatment on January 8, 2014. Dr. Glass diagnosed plaintiff with Mild Neurocognitive Impairment, a closed head injury, major depression with anxiety, persistent irritability, and anger dyscontrol connected to the closed head injury. Pl.'s Ex. J. In May 2014 Dr. Glass suggested that plaintiff would require psychiatric treatment 1-3 times per week for the next 12-18 months. Id.

Discussion

**1. Amending Pleading Standard**

Pursuant to Fed. R. Civ. P. 15(a)(2), leave to amend pleadings shall be freely given "when justice so requires." A court should allow a party to amend its pleading so long as there is no undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies, undue prejudice or futility of the amendment. See Foman v. Davis, 371 U.S. 178, 182 (1962); see also Shane v. Fauver, 213 F.3d 113, 115 (3d Cir. 2000). "'[A]bsent undue or substantial prejudice . . . denial [can] be grounded in bad faith or dilatory motive, truly undue or unexplained delay, repeated failure to cure deficiency by amendments previously allowed or futility of amendment.'" Long v. Wilson, 393 F.3d 390, 400 (3d Cir. 2004) (quoting Lundy v. Adamar of N.J., Inc., 34 F.3d 1173, 1196 (3d Cir. 1994) (internal quotation marks omitted)). Here, where there is an absence of bad

faith, dilatory motive, or delay, the Court need only consider whether plaintiff's proposed amendment is futile. An amended complaint is futile if it fails to state a claim upon which relief could be granted. Burtch v. Milberg Factors, Inc., 662 F.3d 212, 231 (3d Cir. 2011) (citation omitted). To determine if an amendment is futile a court should use "the same standard of legal sufficiency as applies under Rule 12(b)(6)." Id. (citation omitted).

**2. The Federal Tort Claims Act**

Under the Federal Tort Claims Act (FTCA), any party asserting a claim for money damages arising out of the negligent or wrongful act of a government employee must first file a claim with the administrative agency at issue. 28 U.S.C. § 2675(a). The agency then has six months within which to consider the claim and respond. 28 C.F.R. § 14.2. The injured party may file suit after the claim is denied or after the time has expired without any action taken by the agency. 28 U.S.C. § 2675(a). A party may amend his or her claim up until the agency issues a final denial or upon the exercise of the claimant's option to sue after the expiration of the agency's six month consideration period. 28 C.F.R. § 14.2. In any lawsuit filed, the claimant is limited to the amount of the administrative claim. The purpose of the "sum certain" limitation in § 2675 "is to ensure that federal agencies charged with making an initial attempt to settle tort claims against the United States

are given full notice of the government's potential liability." Low v. United States, 795 F.2d 466, 471 (5th Cir. 1986).

There is, however, an exception to the sum certain limitation "where the increased amount is based upon newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." 28 U.S.C. § 2675(b). The burden is on the plaintiff to prove that he or she is entitled to seek damages in excess of the amount sought in the administrative tort claim under this exception. Schwartz v. United States, 446 F.2d 1380, 1381 (3d Cir. 1971). While there is no legislative history of § 2675(b) to resolve Congress's intent in crafting this exception,[7] different circuit courts have implemented their own standards to evaluate whether "newly discovery evidence" or "intervening facts" warrant application of the exception to the sum certain requirement. Generally, there are three tests courts utilize: the worst-case prognosis test, the reasonably discoverable/foreseeable test and the change in expectations test. Unfortunately, there is a dearth of Third Circuit precedent on

---

[7] See Michels v. United States, 31 F.3d 686, 688 (8th Cir. 1994) ("[w]e know of no legislative history (from before or after the FTCA was amended in 1966) that sheds light on how Congress intended the § 2675(b) exception to be applied.").

this issue. Since there is no binding Third Circuit precedent on point, the Court will consider each test in turn.[8]

The worst-case prognosis test first appeared in Low v. United States, 795 F.2d 466 (5th Cir. 1986). In Low, the plaintiff alleged that the defendant committed medical malpractice during her son's birth at a Navy medical facility which caused her son severe permanent injuries. Id. When the plaintiff's son was two years-old, the plaintiff filed an administrative tort claim seeking $1,275,000 in damages. Id. at 468. The plaintiff later increased her claim to $12 million and argued that at the time she filed the original administrative tort claim it was too early to know "a final prediction" of the extent of her son's injuries. Id. at 470. While the district court permitted a jury verdict in excess of the original $1,275,000 claim, the Fifth Circuit reversed, finding that at the time the administrative tort claim was filed the plaintiff knew the "worst-case prognosis" for her son "was one of great severity." Id. at 471. In other words, according to the Fifth Circuit, a plaintiff must predict not only what is within the reasonable universe of injuries or damages, but must assume the worst-case could occur in making a FTCA demand. See also Lebron v. United States, 279 F.3d 321, 330 (5th Cir. 2002) (applying the

---

[8] In Zurba v. United States, 318 F.3d 736 (7th Cir. 2003) the Seventh Circuit applied both the worst-case prognosis and reasonable discoverable tests. The Third, Ninth, Tenth and D.C. Circuits have not yet adopted a standard test.

worst-case prognosis test to a FTCA claim). On similar facts to
Low, the worst-case prognosis test was subsequently adopted by the
First Circuit in Reilly v. United States, 863 F.2d 149 (1st Cir.
1988) ("[t]he mere fact that these dread consequences, feared from
the beginning, had become more certain does not suffice to brand
them 'newly discovered.'").

In contrast, the Second, Fourth, Sixth and Eighth Circuits
have adopted a reasonably discoverable or reasonably foreseeable
test to determine if "newly discovered evidence" or "intervening
facts" are present. See, e.g., O'Rourke v. E. Air Lines, Inc., 730
F.2d 842 (2d Cir. 1984); Spivey v. United States, 912 F.2d 80 (4th
Cir. 1990); Allgeier v. United States, 909 F.2d 869 (6th Cir.
1990); Michels v. United States, 31 F.3d 686 (8th Cir. 1994). The
leading case applying the "reasonably discoverable" test is
Michels v. United States. In Michels, the plaintiff was injured
when his motorcycle collided with a government vehicle. 31 F.3d
686, 687 (8th Cir. 1994). The plaintiff originally filed an
administrative claim of $450,000, but following a bench trial, was
awarded $710,000 in damages because the district court found that
the plaintiff had no signs of a later-developing knee condition at
the time the claim was filed and did not know that he would be
permanently unable to manage his family farm. Id. at 687. The
Eighth Circuit affirmed the district court, finding that a "known
injury can worsen in ways not reasonably discoverable by the

12

claimant and his or her treating physician, [and] such 'newly discovered evidence' or 'intervening facts,' if convincingly proved, can warrant § 2675(b) relief." Id. at 688.

The third approach adopted by the Eleventh Circuit is the "change in expectations" test. Fraysier v. United States, 766 F.2d 478 (11th Cir. 1985). In Fraysier, the plaintiff sued the United States following an extreme reaction to the swine flu vaccine. Later, the plaintiff increased his claim when he was diagnosed with Guillain-Barre Syndrome which caused permanent injury. Id. at 479. The court stated that the "legal question becomes whether this change in expectation, reasonably based, is newly discovered evidence within the meaning of the statute." Id. at 480. In applying Section 2675(b), the Eleventh Circuit found that at the time the original administrative claim was filed, plaintiff had "no reason to believe that his condition would be permanent" and permitted damages above the amount claimed. Id.

For the reasons to be discussed, the Court will apply the reasonably discoverable majority approach. As an initial matter, under the worst-case prognosis standard, a plaintiff cannot set forth a reasonable settlement value to the federal agency. Rather, he or she is forced to inflate all damage projections for fear of the inability to later amend the demand. This is neither conducive to efficient administrative processing nor settlement discussions. Further, the worst-case scenario approach is difficult to apply in

13

practice because it requires a probing analysis into whether a reasonable doctor or patient did, or should have, projected the worst possible result for the plaintiff, even if that outcome is unforeseeable or even outlandish. See Michels, 815 F. Supp. at 1263 (citing various policy reasons supporting the reasonable expectations approach including facilitating settlements and providing better notice to the Government); see also Murphy v. United States, 833 F. Supp. 1199, 1203-04 (E.D. Va.) (finding the reasonable expectations approach preferable as "more favorable to the injured party."). As to the change of expectations test adopted by the Eleventh Circuit, the Court believes the test is too subjective and difficult to apply.

The reasonably discoverable approach best accommodates the competing interests in this context. While still fact intensive, the reasonably discoverable approach focuses on whether it was foreseeable that the plaintiff's injuries would worsen beyond the original claim. This approach is consistent with the language in Section 2675(b) which permits an amendment where the new evidence was not "*reasonably* discoverable." 28 U.S.C. § 2675(b) (emphasis added); see also Norrell v. United States, C.A. No. 1:303, 2002 WL 32060141, at *7 (E.D. Tenn. Aug. 1, 2002) ("if the precise nature, extent and duration of each recognized injury must be known before § 2675(b) will be given effect, then the statute would be rendered useless").

14

### 3. Plaintiff's Medical History

With this case law in mind, the Court now turns to plaintiff's proposed amendment and will apply the reasonably discoverable test. Plaintiff asserts that two worsening injuries, newly discovered psychiatric/cognitive problems and left shoulder and upper extremity conditions, have required unforeseen ongoing treatment and have rendered him permanently disabled. Pl.'s Br. at 5. Specifically, plaintiff argues that he has been unable to return to work due to his ongoing psychiatric symptoms and the brachial plexopathy in his shoulder. Id. at 6. Due to these unforeseen conditions, plaintiff argues, he should be permitted to seek recovery in excess of the $1 million demanded in his August 14, 2012 Amended Notice. Id. To evidence these increased medical problems, plaintiff largely relies upon his extensive medical records. Thus, the Court must analyze whether plaintiff's psychiatric/cognitive problems and left shoulder and upper extremity conditions were not reasonably discoverable as of August 14, 2012, the date plaintiff submitted his amended administrative tort claim.

Plaintiff's post-accident medical history is extensive and complicated, and at times showed progress and at other times showed setbacks. It is understandable, therefore, why the eventual seriousness of plaintiff's injuries did not become reasonably discoverable until after August 14, 2012. The Court's takeaway

from plaintiff's history is that it only became reasonably foreseeable after plaintiff's August 14, 2012 Amended Notice that plaintiff would be permanently disabled. After all, plaintiff was cleared to return to work on April 12, 2012 by Dr. O'Shea and plaintiff expected that his August 24, 2012 discectomy and arthroplasty would successfully alleviate his problems. Further, it was only after August 14, 2012, based on the reports of two physicians, that it became reasonably foreseeable that plaintiff's continuing physical problems and pain were due to brachial plexopathy. In addition, it was not until after August 14, 2012 that plaintiff was diagnosed with serious psychiatric and cognitive problems. Although there were fleeting references to these new problems in plaintiff's medical records, they only became reasonably foreseeable after the physicians' diagnoses. Plaintiff was not required to foresee the worst-case scenario which unfortunately appears to have come to fruition.

Beginning with plaintiff's psychiatric/cognitive problems, defendant contends that plaintiff was aware of these issues prior to August 14, 2012. Defendant cites plaintiff's January 21, 2011 neurological exam with Dr. Burakgazi who noted plaintiff's memory disturbance and double vision (Def.'s Ex. D-12). Defendant also cites to Dr. O'Shea's April 10, 2012 notes of plaintiff's complaints of memory difficultly and suggestion that plaintiff follow-up with a neurologist (Pl.'s Ex. D), Dr. Lipsius's notes of

16

plaintiff's memory loss complaints on May 10, 2012 (Def.'s Ex. D-14), Dr. Lipsius's notes on June 27, 2012 that plaintiff was "likely depressed" (Def.'s Ex. D-16), Dr. Falconiero's notes that plaintiff was depressed on July 11, 2012 (Def.'s Ex. D-17), and Dr. Lipsius's July 26, 2012 recommendation that plaintiff should undergo a neuropsychological evaluation if plaintiff's depression did not improve (Def.'s Ex. D-18).

Plaintiff responds that prior to the filing of his amended tort claim the medical experts believed his complaints of depression and memory issues stemmed from his orthopedic injuries rather than a closed head injury as diagnosed by Dr. Glass in January 2013. Pl.'s Br. at 6. Plaintiff argues that because his psychiatric condition is not orthopedic, he will require "significant psychiatric treatment" and will be unable to return to work. Pl.'s Reply Br. at 7. In other words, although plaintiff recognizes his symptoms were known, plaintiff argues that his psychiatric symptoms which are now known to be caused by a closed head injury constitute a new condition unknown and untreated at the time his Amended Notice was filed. Pl.'s Reply at 6.

The Court finds that plaintiff has the better argument. In May 2014, Dr. Glass noted that Dr. McGowan previously "doubted a relationship" (even as late as October 2012) between plaintiff's cognitive complaints and traumatic brain injury. However, it was not until relatively recently that Dr. Glass opined that

17

plaintiff's mild neurocognitive impairment was due to his closed brain injury and was a "direct result" of plaintiff's accident. Pl.'s Ex. J. Further, it was not until May 2014 that Dr. Glass suggested that plaintiff would require psychiatric treatment 1-3 times per week for the next 12-18 months. Id.

While it is uncontested that plaintiff reported some psychiatric symptoms to various doctors prior to filing his Amended Notice, and that Dr. Lipsius suspected plaintiff had a closed head injury as early as May 2012, it was not until January 2013 that Dr. Glass associated plaintiff's psychiatric symptoms, including depression and irritability, with his closed head injury. Prior to Dr. Glass's diagnosis these symptoms were associated with plaintiff's orthopedic injuries. See, e.g., Def.'s Ex. D-19 (following October 10, 2012 evaluation Dr. McGowan opined "there is little evidence to suggest that [plaintiff] suffers from significant continuing cognitive complaints related specifically to traumatic brain injury . . . . diagnostically I feel that he suffers from somatoform disorder with primary neuropsychological and pain-related complaints"). Therefore, Dr. Glass's diagnosis was unknown at the time plaintiff filed his Amended Notice. See also Murphy v. United States, 833 F. Supp. 1199, 1204 (E.D. Va. 1993) (finding that where plaintiff and health care providers were not aware of full extent of plaintiff's cognitive deficits when the administrative claim was filed, plaintiff was entitled to

increase *ad damnum*); Adkins v. United States, 990 F. Supp. 2d 621, 627-28 (S.D.W. Va. 2014) (plaintiff permitted to increase administrative tort claim where it was not until after the claim was filed that medical experts "established concretely" that plaintiff's son would have permanent disabilities).

Defendant asserts that plaintiff was also aware of his shoulder and upper extremity issues prior to August 14, 2012. In support of this contention, defendant cites plaintiff's January 21, 2011 neurological exam with Dr. Burakgazi which reported that plaintiff could have radiculopathy (Def.'s Ex. D-12), plaintiff's orthopedic surgery to repair a left rotator cuff injury on June 30, 2011 performed by Dr. Kozielski (Pl.'s Ex. B), Dr. O'Shea's April 10, 2012 notes of similar complaints (Pl.'s Ex. D), Dr. Cervantes's cervical spine surgery findings (Pl.'s Ex. E), Dr. Lipsisus's notes on June 28, 2012 stating that plaintiff complained of exquisite left shoulder pain and radiating neck pain (Def.'s Ex. D-16), and Dr. Facloniero's July 11, 2012 exam noting shoulder and neck difficulties (Def.'s Ex. D-17). Def.'s Br. at 24-25.

Plaintiff responds that while his shoulder pain was known before he filed his Amended Notice, he is now diagnosed with brachial plexopathy, a condition undiagnosed until 2013. Pl.'s Reply at 4. Specifically, plaintiff argues that his brachial plexopathy was "masked" by his rotator cuff and cervical spine injuries, for which he had two surgeries to remedy. Pl.'s Br. at

12.[9] Additionally, plaintiff relies on Dr. O'Shea's April 10, 2012 opinion that plaintiff could return to light duty work. Id. at 14. Plaintiff contends that two subsequent EMGs, one on November 7, 2012 and another on January 28, 2013, revealed plaintiff suffered from multilevel cervical radiculitis, radiculopathy at C7, C8 and T1 and brachial plexopathy, respectively. Id. at 15. Until these new diagnoses, plaintiff contends he believed he was only suffering from a torn rotator cuff and multiple cervical herniations since alternative conditions were ruled out. Pl.'s Reply at 4 (citing Def.'s Ex. D-13).

In a remarkably similiar West Virginia case, Creech v. United States, C.A. No. 06-279, 2007 WL 853768 (W.D. Va. Mar. 16, 2007), the plaintiff knew she suffered from shoulder and neck pain at the time her administrative claim was filed but was not diagnosed with radiculopathy until afterward. The defendant, the U.S. Postal Service, argued that because the plaintiff had neck pain at the time the claim was filed, "she bore the burden of discovering the source of her discomfort through all available diagnostic testing before filing an administrative claim for relief." Id. at *2. The court rejected this argument and found that the plaintiff had sought significant medical care and found "the radiculopathy was simply not diagnosed at the time the complaint was filed despite

---

[9] The Court reviewed the medical records in detail and could not find any specific reference by a medical provider that plaintiff's brachial plexopathy was "masked" by other injuries.

plaintiff and her physicians' best efforts to identify and treat her injuries." Id. Therefore, the court permitted the plaintiff to increase her ad damnum demand. See also Lopatina v. United States, C.A. No. 09-2852, 2011 WL 6217036, at *4 (D. Md. Dec. 13, 2011) aff'd, 528 Fed. Appx. 352 (4th Cir. 2013) (plaintiff permitted to seek damages beyond administrative tort claim at trial where shoulder injury "evolved" into a neck problem requiring surgery); MacDaniel v. U.S. Postal Serv., C.A. No. 3:97-CV-667, 1999 WL 33921854, at *2 (D. Conn. Aug. 20, 1999) (it was not foreseeable that plaintiff's lumbar injury would deteriorate after the administrative claim was filed thus the plaintiff was permitted to amend her complaint to seek damages beyond claim); Michels v. United States, 31 F.3d 686, 688 (8th Cir. 1994) (noting that a known injury can worsen in ways not reasonably discoverable by the claimant or her physician and that such worsening can constitute newly discovered evidence or intervening facts). Similar to the plaintiff in Creech, plaintiff sought the opinion of over half a dozen neurologists, orthopedists, physical therapists, pain management specialists and psychiatrists. Although plaintiff repeatedly reported his neck and shoulder pain, the diagnoses of cervical radiculitis, radiculopathy and brachial plexopathy was not made until after the Amended Notice was filed.

Defendant relies on Norrell v. United States, C.A. No. 02-303, 2002 WL 32060141 (E.D. Tenn. Aug. 1, 2002), to suggest that

plaintiff has not provided newly discovered evidence warranting a claim amendment. This case is distinguishable. In Norrell, the plaintiff knew he had a cervical spine injury, but asserted that his subsequent need for surgery was newly discovered evidence. Id. at *5. In this case plaintiff is not merely asserting, as did the plaintiff in Norrell, that only the treatment for his injury was unknown. Rather, plaintiff asserts that his conditions were undiagnosed, or ruled out, at the time he filed his Amended Notice.

The Court finds that plaintiff has presented newly discovered evidence that was not reasonably foreseeable on August 14, 2012. On February 23, 2012, plaintiff's EMG results stated "[t]here is no electrodiagnostic evidence suggestive of an acute or chronic radiculopathy [or] plexopathy." Def.'s Ex. D-13. These results were echoed by Dr. Falconiero on July 11, 2012. Def.'s Ex. D-17. Thus, plaintiff did not receive his diagnoses of cervical radiculitis, radiculopathy and brachial plexopathy prior to August 14, 2012. In fact, it appears that before August 14, 2012, these diagnoses were ruled out. It was not until later, on January 16, 2013, that Dr. Kozielski opined that plaintiff "may be suffering from brachial plexopathy associated with his initial injury" and recommended another EMG "to rule out" brachial plexopathy as a diagnosis. Def.'s Ex. D-20. Further, on January 24, 2013, Dr. Cervantes stated he had "no clue where Mr. Bravo's complain[t]s are coming from" though he opined that plaintiff's physical

22

examination was "not suggestive of any brachial plexopathy[.]" Def.'s Ex. D-21. Another EMG was conducted on January 28, 2013. Def.'s Ex. D-23. The electrodiagnostic impression was:

> The chronic changes noted in the biceps and infraspinatus with the polyphasia noted in the deltoid on the left implicated the C5 and C6 root levels and/or the upper trunk of the brachial plexus. It is not possible to differentiate based on the results noted as there was no acute denervation which could be traced more proximally, the best that can be said is that electrodiagnostically there are chronic changes either in an upper trunk distribution or C5-6 distribution. Again there is no evidence for acute denervation in any muscle evaluation.

Id. Dr. Cervantes reviewed the results of this EMG and, according to plaintiff's case manager, concluded that the results did not show plaintiff had a brachial plexus injury. Def.'s Ex. D-25. Dr. Kozielski disagreed. Pl.'s Ex. L. He found that the EMG results showed a cervical spine injury, brachial plexus and left shoulder injuries. Id. Additionally, on June 14, 2013, after reviewing plaintiff's third EMG, Dr. Spagnoletti concluded that plaintiff suffered from cervical radiculopathy, myofascial pain syndrome, a left rotator cuff injury, cervical degenerative disc disease and a closed head injury with post-traumatic cephalgia. Def.'s Ex. D-27. Thus, plaintiff's doctors disagreed as to whether or not plaintiff had brachial plexopathy. The Court will not punish plaintiff because two doctors believed plaintiff had brachial

plexopathy and one did not.[10] Additionally, it is not the burden of the tort victim, as defendant suggests, to predict with certainty his or her final prognosis merely because he or she can point to persistent symptoms. Such a policy would impose an undue burden on tort victims that is not supported in the case law.

The Court finds that plaintiff could not have reasonably discovered before his Amended Notice was filed that his psychiatric symptoms were causally related to his closed head injury or that he would be diagnosed in January 2013 with cervical radiculitis, radiculopathy at C7, C8 and T1 and brachial plexopathy. For these reasons, these new diagnoses constitute newly discovered evidence sufficient to warrant granting plaintiff's motion to increase his demand.

Conclusion

In conclusion, the Court finds plaintiff has presented newly discovered evidence warranting the application of the exception to the sum certain rule. The Court will therefore permit plaintiff to file his proposed amended complaint which most notably increases his demand from $1 million to up to $5 million.

**ORDER**

Accordingly, for all the foregoing reasons,

---

[10] Additionally, from the record before the Court, it was not until after the Amended Notice was filed that plaintiff learned he may never be able to return to work. At the time the Amended Notice was filed no doctor had suggested that plaintiff would be permanently disabled.

IT IS on this 15th day of January, 2015 hereby

ORDERED that plaintiff's "First Motion to Amend/Correct Complaint" is GRANTED. Plaintiff shall file and serve the amended complaint attached to his motion by January 26, 2015.

s/ Joel Schneider
JOEL SCHNEIDER
United States Magistrate Judge